# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

## No. 16-2692

_____

THEODORE HAYES and AQEELA FOGLE
Appellants
v.
PHILIP HARVEY
Appellee

_____

On Appeal from the Order and Memorandum Opinion
of the United States District Court for the Eastern District of Pennsylvania
Denying Plaintiffs' Motion for Summary Judgment and
Granting Defendant's Motion for Summary Judgment
dated May 10, 2016

_____

## BRIEF OF APPELLANT

_____

Rachel Garland
George Gould
Michael Donahue
Community Legal Services
1424 Chestnut Street
Philadelphia, PA 19102
215-981-3778
rgarland@clsphila.org
ggould@clsphila.org
mdonahue@clsphila.org

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................4

SCOPE OF REVIEW...................................................................................5

STATEMENT OF THE CASE........................................................................6

STATEMENT OF FACTS .............................................................................8

     A.  It is an undisputed fact that the Hayes family's home was part of a Section 8 project-based development from 1982 to 2009. ...............8

     B.  It is an undisputed fact that the Hayes family was issued an Enhanced Voucher in 2010 pursuant to the Enhanced Voucher Statute when their former landlord opted-out of renewing the project-based contract with HUD.....................................12

     C.  It is an undisputed fact that the Hayes family continues to rent their home from Defendant Harvey pursuant to an Enhanced Voucher subsidized lease agreement......................................14

     D.  It is an undisputed fact that Defendant Harvey is seeking to evict the Hayes family from their home.................................14

     E.  Court Action.........................................................................17

SUMMARY OF ARGUMENT .......................................................................19

ARGUMENT ............................................................................................21

  I.  Scope of Review ..........................................................................21

  II.  The Hayes family's tenancy is protected by the Right to Remain. ....................................................................................21

     A.  The Hayes family's tenancy is protected by the Enhanced Voucher Statute's Right to Remain. ........................................22

i

B.  The Hayes family's tenancy is protected by the Right to
    Remain according to HUD guidance. ....................................................27

C.  The Hayes family's tenancy is protected by the Right to
    Remain according to federal court interpretation of the
    Enhanced Voucher Statute and HUD guidance. .....................................29

D.  Defendant Harvey does not have sufficient good cause to
    evict the Hayes family.............................................................................34

III.  The District Court erred in determining that the Right to
      Remain does not extend beyond the initial Enhanced Voucher
      lease term. ...............................................................................................38

A.  The District Court's analysis conflated three federal subsidies
    and incorrectly intermingled their statues and regulations. ....................38

B.  The District Court's interpretation of the Enhanced Voucher
    Statute is contrary to the plain meaning of the statute............................43

C.  The District Court erred in failing to consider agency
    guidance. .................................................................................................47

D.  The District Court's interpretation conflicts with the
    unanimous decisions of the other federal courts that have
    interpreted the statute. .............................................................................49

E.  The District Court erred in finding that the Right to Remain
    does not extend beyond the initial Enhanced Voucher lease
    term...........................................................................................................51

CONCLUSION .....................................................................................................56

CERTIFICATIONS OF COMPLIANCE WITH RULES......................................57

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Albright v. Virtue*, 273 F.3d 564 (3d Cir. 2001) ..................................................5, 21

*Barrientos v. 1801-1825 Morton, LLC*, No. 06-6437, 2007 WL
    7213974 (C.D. Cal. Sept. 10, 2007)*, aff'd on other grounds,*
    583 F.3d 1197 (9th Cir. 2009) .................... 30, 31, 32, 33, 36, 46, 47, 50, 53, 54

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ...............................................48

*Dodson v. Salvitti*, No. 74-1854 (E.D. Pa 1977), *aff'd*
    *mem.* 571 F.2d 571 (3d Cir.), *cert. denied*, 439 U.S.
    883 (1978) ...........................................................................................................10

*Estevez v. Cosmopolitan Assocs. LLC*, No. 05-4318, 2005
    WL 3164146 (E.D.N.Y Nov. 28, 2005) ............................. 29, 30, 31, 50, 53, 54

*Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063 (D.C. Cir. 2008) ........................29, 50

*Giles v. Kearney*, 571 F.3d 318 (3d Cir. 2009)....................................................5, 21

*Hagans v. Commissioner of Social Sec.*, 694 F.3d 287 (2012) ..............................48

*Jeanty v. Shore Terrace Realty Ass'n*, No. 03-8669, 2004
    WL 1794496 (S.D.N.Y. Aug. 10, 2004)........................................................29, 50

*Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010) ................................5, 21

*McNeil v. United States*, 131 S.Ct. 2218 (2011).....................................................44

*Octavia Hill Association, Inc. v. Hayes*, Nos. 73-1599
    (E.D. Pa. Oct. 16, 1973).....................................................................................10

*Park Village Apartments Tenants Ass'n. v. Mortimer*
    *Howard Trust*, 636 F.3d 1150 (9th Cir. 2011)..................................30, 33, 49, 50

*People to End Homelessness, Inc. v. Develco Singles Apartments Assocs*, 339 F.3d 1 (1st Cir. 2003) ...............................................50, 51

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ....................................................48, 49

*Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045 (3d Cir. 1980) ..........................................................................................................11

*United States v. Cooper*, 396 F.3d 308 (3d Cir. 2005) ...........................................44

## **Statutes**

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1

28 U.S.C. § 2201 ..........................................................................................1

28 U.S.C. § 2202 ..........................................................................................1

42 U.S.C. § 1437f(c)(8) ..........................................................................................23

42 U.S.C. § 1437f(c)(8)(a) ..........................................................................................12

42 U.S.C. § 1437f(o) ......................................................................................... 9, 24, 40

42 U.S.C. § 1437f(o)(10)(A) ..........................................................................................25

42 U.S.C. § 1437f(o)(7)(C) ......................................................................................... 31, 42, 54

42 U.S.C. § 1437f(t) ........ 1, 2, 6, 8, 19, 24, 25, 26, 28, 30, 32, 35, 36, 41, 43, 44, 47

Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815 (1988) ........................................................23

H.R. Conf. Rep. No. 106-710 (2000)..........................................................................................25

Housing and Urban Development Act of 1968, Pub. L. No.
   90-448, 82 Stat. 476 (1968) ...................................................................22

Low Income Housing Preservation and Resident
   Homeownership Act of 1990, Pub. L. No. 101-625, 104 Stat.
   4079 (1990) ..............................................................................................23

Multifamily Assisted Housing Reform and Affordability Act,
   Pub. L. No. 105-65, 111 Stat. 1344 (1997) ......................................23, 24

Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508,
   104 Stat. 1388-506 (1990) ......................................................................55

Pub. L. No 106-74, 113 Stat. 1047 (1999) ....................................... 24, 41

Pub. L. No. 105-276, 112 Stat. 2461 (1998) ............................................23

Pub. L. No. 106-246, 114 Stat. 511 (2000) .......................... 24, 25, 41, 42

Pub. L. No. 75-412, 50 Stat. 888 (1937) ..................................................22

## **Regulations**

24 C.F.R. § 221.524 (1970) ......................................................................23

24 C.F.R. § 247.3 and § 247.4 ..................................................................54

24 C.F.R. § 402.8 (2009) ..........................................................................28

24 C.F.R. § 880.607 (2010) ......................................................................39

24 C.F.R. § 966.4 (2016) ................................................................... 22, 54

24 C.F.R. § 982 (2015) .............................................................................40

24 C.F.R. § 982.310 (2015) ......................................................................32

## **Other Authorities**

HUD, Section 8 Renewal Policy (2008 and 2015) ............. 19, 27, 28, 36, 38, 47, 48

IRS Rev. Rul. 2004-82, Q&A 5 (2004) ................................................................55

Letter from Benjamin T. Metcalf, Deputy Assistant Secretary
   for Multifamily Housing Program to Multifamily Project
   Owners (June 5, 2014) ...................................................................29, 36, 47, 48

Letter from Michael Dennis, Director, Office of Housing
   Choice Voucher Programs to Public Housing Agencies
   Executive Directors (May 22, 2014) ...............................................29, 36, 47, 48

Written Testimony of Rep. Rick Lazio, Chairman of the House
   Subcommittee on Housing and Community, Section 8
   Housing: Hearing Before the Sen. Subcomm. on Housing
   and Transp., 106th Cong. (1999) .......................................................................26

_____

## STATEMENT OF JURISDICTION
_____

This is an appeal from the Eastern District of Pennsylvania's Order and Memorandum Opinion Denying Plaintiffs' Motion for Summary Judgment and Granting Defendant's Motion for Summary Judgment on May 10, 2016. (Joint Appendix ("J.A.") 2 and 3-23). Plaintiffs filed a Complaint (J.A. 30-45) requesting declaratory relief and any further relief deemed appropriate and a Motion for Preliminary Injunction (J.A. 46-78) to bar the Defendant from evicting Plaintiffs from their home in violation of their Right to Remain under the Enhanced Voucher section of the United States Housing Act of 1937, 42 U.S.C. § 1437f(t). The District Court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory judgment) and 2202 (further relief).

On June 2, 2016, plaintiffs filed a timely notice of appeal to this Court. (J.A. 1). This Court has appellate jurisdiction under 28 U.S.C. § 1291 as it is an appeal of a final order disposing of all claims by the Eastern District of Pennsylvania.

1

_____

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW
_____

1.    Does the Enhanced Voucher section of the United States Housing Act, 42 U.S.C. § 1437f(t) ("Enhanced Voucher Statute"), guidance by the Department of Housing and Urban Development ("HUD") and case law grant Enhanced Voucher tenants a Right to Remain in their homes so long as the tenants do not move out of the home, the family is the original family to receive the Enhanced Voucher, the home continues to be offered as rental housing, and the landlord has no good cause to evict?

Issue ruled upon: (District Court Order Denying Pl.'s Mot. for Summ. J. and Granting Def.'s Mot. for Summ. J., Docket No. 24; J.A. 2), (Memorandum Opinion, Docket No. 25 at 12-19; J.A. 3 at 14-21);  Issue raised: (Plaintiffs' Complaint, Docket No. 4 at 4-6, 12; J.A. 30 at 33-35, 41), (Plaintiffs' Mot. for Prelim. Inj. and Supporting Mem. of Law, Docket No. 2 at 13, 5-11; J.A. 46 at 58, 65-71), (Pl.'s Mot. Summ. J. and Supporting Mem. of Law, Docket No. 16 at 5-12; J.A. 107 at 115-122), (Pl.'s Reply to Def.'s Mot. Summ. J., Docket No. 22 at 3; J.A. 172 at 174);  Issue objected to: (Def.'s Answer to Compl. and Affirmative Defenses, Docket No. 7 at 4, 6-7; J.A. 79 at 82, 84-5), (Def.'s Mem. of Law in Support of Def.'s Opp. to Pl.'s Mot. for Prelim. Inj., Docket No. 9 at 8-15; J.A. 89

2

at 96-103), (Def.'s Mot. Summ. J., Docket No. 17 at 10-18; J.A. 143 at 158-166), (Def.'s Reply to Pl.'s Mot. Summ. J., Docket No. 23 at 2-5; J.A. 178 at 180-182).

2.    Does the Enhanced Voucher Statute, HUD guidance, and case law grant Enhanced Voucher tenants a Right to Remain in their homes despite a change in ownership of the home beyond the initial Enhanced Voucher lease term?

Issue ruled upon: (District Court Order Denying Pl.'s Mot. for Summ. J. and Granting Def.'s Mot. for Summ. J., Docket No. 24; J.A. 2), (Memorandum Opinion, Docket No. 25 at 9-19; J.A. 3 at 11-21); Issue raised: (Plaintiffs' Complaint, Docket No. 4 at 4-6, 12; J.A. 30 at 33-35, 41), (Plaintiffs' Mot. for Prelim. Inj. and Supporting Mem. of Law, Docket No. 2 at 13, 5-11; J.A. 46 at 58, 65-71), (Pl.'s Mot. Summ. J. and Supporting Mem. of Law, Docket No. 16 at 5-16; J.A. 107 at 115-126), (Pl.'s Reply to Def.'s Mot. Summ. J., Docket No. 22 at 3; J.A. 172 at 174); Issue objected to: (Def.'s Answer to Compl. and Affirmative Defenses, Docket No. 7 at 4, 6-7; J.A. 79 at 82, 84-5), (Def.'s Mem. of Law in Support of Def.'s Opp. to Pl.'s Mot. for Prelim. Inj., Docket No. 9 at 8-15; J.A. 89 at 96-103), (Def.'s Mot. Summ. J., Docket No. 17 at 10-18; J.A. 143 at 158-166), (Def.'s Reply to Pl.'s Mot. Summ. J., Docket No. 23 at 2-5; J.A. 178 at 180-182).

_____

## STATEMENT OF RELATED CASES AND PROCEEDINGS
_____

On May 25, 2016 Defendant Harvey filed a Landlord and Tenant Complaint in the Municipal Court of Philadelphia (J.A. 247), a year after the Plaintiffs filed their Complaint (J.A. 30-45) and Motion for Preliminary Injunction (J.A. 46-78) in the Eastern District of Pennsylvania on May 12, 2015.  At the Municipal Court hearing on June 28, 2016, the judge entered an order deferring the case pending final adjudication of Plaintiffs' appeal (J.A. 248) due to the District Court's Order Granting an Injunction Pending Appeal on June 22, 2016.  (J.A. 246)

_____

## SCOPE OF REVIEW
_____

In reviewing the District Court's final decision on the parties' cross motions

for summary judgment, this Court performs a plenary review.  *Kelly v. Borough of*

*Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010) (citing *Giles v. Kearney*, 571 F.3d 318,

322 (3d Cir. 2009)); *Albright v. Virtue*, 273 F.3d 564, 570 (3d Cir. 2001).

_____

## STATEMENT OF THE CASE

_____

This is an appeal of an Order and Memorandum Opinion by the United States District Court for the Eastern District of Pennsylvania Denying Plaintiffs' Motion for Summary Judgment and Granting Defendant's Motion for Summary Judgment ("District Court Order and Memorandum Opinion") (J.A. 2 and 3-23).

The Plaintiff-Appellants in this action are a low-income family ("Hayes family") who are facing eviction from the home they have rented since 1982, first with a Section 8 project-based subsidy, and then with the assistance of a Section 8 tenant-based Enhanced Voucher ("Enhanced Voucher") pursuant to the Enhanced Voucher section of the United States Housing Act of 1937, 42 U.S.C. § 1437f(t), ("Enhanced Voucher Statute").  The Hayes family brings this action against their landlord, Defendant-Appellee Philip E. Harvey ("Defendant Harvey"), to enforce federal law granting them the Right to Remain in their subsidized home pursuant to the protections of the Enhanced Voucher Statute.  42 U.S.C. § 1437f(t).

On May 12, 2015 the Hayes family filed a Complaint (J.A. 30-45) and Motion for Preliminary Injunction (J.A. 46-78) in the Eastern District of Pennsylvania seeking to enjoin Defendant Harvey, or anyone acting on his behalf, from evicting the Hayes family from their home at 538B Pine Street or taking any

action to accomplish such an eviction.  On September 13 and 14, 2015 the Hayes family and Defendant Harvey filed cross motions for summary judgment. (J.A. 107-142 and 143-171).  On May 10, 2016 the District Court entered an Order and Memorandum Opinion denying the Hayes family's Motion for Summary Judgment and granting Defendant Harvey's Motion for Summary Judgment and an additional Order denying the Hayes family's motion for preliminary injunction as moot.  (J.A. 2, 3-23 and 24).  The Hayes family timely filed an appeal on June 2, 2016 to the Third Circuit Court of Appeals (J.A. 1) and a Motion for Injunction Pending Appeal (J.A. 205) in the District Court requesting that the District Court bar Defendant Harvey from evicting the Hayes family pending the outcome of the appeal.  On June 22, 2016 the District Court granted the injunction pending appeal. (J.A. 246).

The District Court erred as a matter of law when it found that the Hayes family's Right to Remain did not last beyond the first year of their lease. Plaintiffs, through counsel, bring this appeal seeking to reverse the District Court Order and Memorandum Opinion  and find that Defendant Harvey does not have good cause to evict or fail to renew lease for the Hayes family in violation of their Right to Remain in their home pursuant to the Enhanced Voucher Statute.

———————————————

## STATEMENT OF FACTS

———————————————

The Plaintiff-Appellants in this action are a low-income African-American family ("Hayes family") who have lived in the Society Hill neighborhood of Philadelphia for over 80 years and have spent much of that time advocating for the preservation affordable housing and promoting the continued socio-economic and racial diversity of the neighborhood.  The Hayes family are facing eviction from 538B Pine Street in Philadelphia, the home they have rented since 1982, first with a Section 8 project-based subsidy, and then with the assistance of a Section 8 tenant-based Enhanced Voucher (hereinafter "Enhanced Voucher") pursuant to the Enhanced Voucher Section of the United States Housing Act of 1937, 42 U.S.C. § 1437f(t) ("Enhanced Voucher Statute").  The Defendant-Appellee in this action, Philip E. Harvey ("Defendant Harvey"), is the current owner of the property parcel consisting of three duplexes located at 536-540 Pine Street, which includes the Hayes' family's home, 538B Pine Street.

### A. It is an undisputed fact that the Hayes family's home was part of a Section 8 project-based development from 1982 to 2009.

The Hayes family home at 538B Pine Street was built in 1982 as part of Washington Square East, a Section 8 project-based housing development in

Society Hill in Philadelphia that was federally subsidized pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f.  (J.A. 315).  Now one of Philadelphia's wealthiest and most exclusive neighborhoods, historically, Society Hill was one of the first black neighborhoods in Philadelphia.  (J.A. 52).  A block from the Hayes family's home is Starr Garden, a popular playground at Sixth and Lombard Streets that is named for Theodore Starr (1841-1884), a local black businessman who donated the land to the city for use as a playground.  (J.A. 52). Down the street is Mother Bethel Church, the first African Methodist Episcopal Church which was founded by Richard Allen, one of the nation's first black ministers, who lived in the neighborhood.  (J.A. 52).

In the early 1900s Philadelphia was expanding and Society Hill was turning into a slum as the housing stock aged and deteriorated.  (J.A. 53).  Octavia Hill Association, founded on the progressive affordable housing principals of the British Octavia Hill, began renovating and building low-income housing in Society Hill to provide clean and affordable places for low-income Philadelphians to live. (J.A. 53).  In the 1950s local, state and federal government and development corporations began serious development of Society Hill, working to preserve historic buildings, moving the dock market and constructing Society Hill towers and other high-end housing.  (J.A. 53).

By the 1970s Octavia Hill Association could no longer afford to maintain

their properties with the low-income rents that they were charging.  (J.A. 53).  In

1972 Octavia Hill Association filed an action in ejectment against their tenants in

state court that was removed to federal court and resulted in a settlement whereby

the remaining tenants, including the Hayes family, would agree to move out in

return for temporary housing and the Philadelphia Redevelopment Authority's

promise to rehabilitate a property on Pine Street for their permanent relocation.

*Octavia Hill Association*, *Inc. v. Hayes*, Nos. 73-1599 (E.D. Pa. Oct. 16, 1973).

(J.A. 53).  When the Redevelopment Authority failed to come through with its

promise of housing, six of Octavia Hill Association's tenant families, including the

Hayes family, filed a case in the Eastern District of Pennsylvania seeking

declaratory and injunctive relief to force the Redevelopment Authority to comply

with the earlier consent decree.  *Dodson v. Salvitti*, No. 74-1854 (E.D. Pa 1977),

*aff'd mem*. 571 F.2d 571 (3d Cir.), *cert. denied*, 439 U.S. 883 (1978).  (J.A. 53).

From 1972-1982 these six families fought to be able to return to their rapidly

gentrifying neighborhood.  (J.A. 53).  On January 13, 1977 as the second case

neared a settlement, twenty members of the Society Hill civic association moved to

intervene as defendants in the case to explicitly stop the creation of housing for

low-income residents in Society Hill for "economic and quality of life reasons."

(J.A. 54).  In their brief, the neighbors claimed that "it is exceedingly difficult for

10

those who have less to live harmoniously with those who have a great deal."

(J.A. 54 and 633-635).  The motion to intervene was denied and a second consent

decree was eventually finalized.  (J.A. 54).  However, the Society Hill Civic

Association and a group of neighbors then filed a third federal court case to again

try to stop the construction of affordable housing in their neighborhood.  *Society*

*Hill Civic Ass'n v. Harris*, 632 F.2d 1045 (3d Cir. 1980).  (J.A. 54 and 633-635).

The Hayes family and the other low-income tenant families prevailed and as

a result of these three federal court cases and their associated consent decrees and

judicial orders, in 1982 Washington Square East, a fourteen-unit series of row-

home duplexes for low-income tenants was built with federal project-based

Section 8 subsidies under Section 8 of the United States Housing Act of 1937, 42

U.S.C. § 1437f.  (J.A. 54).  The Hayes family moved into one of the units, 538B

Pine Street.  (J.A. 54).

The Hayes family has lived at 538B Pine Street since 1982 and has

continued to take active leadership roles in Starr Garden, Mother Bethel Church

and the local elementary school, McCall, where all four generations of the family

have attended school.  (J.A. 54).  Mrs. Florence Hayes, the family matriarch and

head of household until her death in February 2015, spent her eighty-six years

living in Society Hill, went to school at McCall and was a crossing guard at her

intersection for over fourteen years.  (J.A. 54).

11

**B. It is an undisputed fact that the Hayes family was issued an Enhanced Voucher in 2010 pursuant to the Enhanced Voucher Statute when their former landlord opted-out of renewing the project-based contract with HUD.**

In 2008 Washington Square East's owners chose not to renew the project-based contract they had with the Department of Housing and Urban Development ("HUD") and to sell the three parcels of duplexes individually.  (J.A. 315).  On February 9, 2008 the owner, Pine Street Associates, sent the required one-year notice to the tenants at the time, pursuant to the requirements outlined in the United States Housing Act of 1937,  42 U.S.C. § 1437f(c)(8)(a).  (J.A. 315 and 636-637).

Pine Street Associates and HUD worked with the Philadelphia Housing Authority and in February 2010 the Philadelphia Housing Authority issued each of the Washington Square East tenants at the time, including the Hayes family, tenant-based Enhanced Vouchers to replace their prior project-based rental subsidy.   (J.A. 315 and 638).

In August 2010 Pine Street Associates sold one third of Washington Square East, the property parcel 536-540 Pine Street, to Defendant Harvey for $1.2 million.  (J.A. 315 and 639-642).  The property parcel is a single deeded property comprising three duplex row homes totaling six units.  (J.A. 315).  The three first-floor units are all similarly sized one-bedroom units.  (J.A. 315).  The three second-floor units are also all similarly sized three- to four-bedroom units.  (J.A. 315).

12

On November 8, 2010 Defendant Harvey signed a Section 8 tenant-based lease subsidized with an Enhanced Voucher with the Hayes family for their continued residence at 538B Pine Street. (J.A. 316 and 650-657). On the lease at the time were Florence Hayes, her son Theodore Hayes, her granddaughter Aqeela Fogle, and her three minor great grandchildren. (J.A. 316 and 650-657). The term of the lease was retroactive to May 11, 2010 and the initial lease term ended on April 30, 2011. (J.A. 316 and 650-657).

After conducting a rent reasonableness test to determine the fair-market rent of a four-bedroom apartment in the condition of 538B Pine Street, based on other comparable rents in the immediate neighborhood, the Philadelphia Housing Authority established the contract rent for the apartment as $2,400 per month. (J.A. 316, 650-657 and 669). The Philadelphia Housing Authority normally caps rent and utility payments for a four-bedroom unit rented with a regular tenant-based voucher at $1,546 per month. (J.A. 316 and 669). Defendant Harvey renewed the Hayes family lease in 2011 for a two-year term and again in 2013 for another two-year term. The most recent lease term ended on April 30, 2015. (J.A. 316).

**C. It is an undisputed fact that the Hayes family continues to rent their home from Defendant Harvey pursuant to an Enhanced Voucher subsidized lease agreement.**

On February 2, 2015 the head of household, Mrs. Florence Hayes passed away at the age of eighty six.  (J.A 316).  Her son, Theodore Hayes notified Defendant Harvey and the Philadelphia Housing Authority, who removed Mrs. Hayes as head of household on the lease and processed Mr. Hayes to be the new head of household.  (J.A. 316 and 686).  Mr. Hayes' niece Aqeela Fogle and her three minor children remained on the lease.  (J.A. 316 and 686).  The total contract rent for the unit remains at $2,400 per month, reflecting the enhanced nature of the Hayes family's voucher, as it is an amount in excess of the normal cap of $1,546 that the Philadelphia Housing Authority would allow for rent and utilities a four-bedroom unit. (J.A. 316, 669 and 686).

**D. It is an undisputed fact that Defendant Harvey is seeking to evict the Hayes family from their home.**

On February 17, 2015, Defendant Harvey sent a lease non-renewal notice to the Hayes family stating that due to the recent death of the head of household, Mrs. Hayes, he would not be renewing the lease at the end of the lease term on April 30, 2015 and requested that the Hayes family move out.  The notice also stated that the apartment would be renovated.  (J.A. 317 and 676).  The Hayes family, counsel for the Hayes family, and on information and belief, the Philadelphia Housing Authority, contacted Defendant Harvey by phone and by letter and spoke with his

daughter and agent, Allison Hindman-Harvey, to explain the family's Enhanced Voucher status and their associated Right to Remain.  (J.A. 682-685).  On May 1, 2015 Defendant Harvey delivered a five-day eviction notice stating that if the family did not move out, eviction proceedings would be filed and that Defendant Harvey desired to move a family member into the unit.  (J.A. 317 and 677).  On May 25, 2016 Defendant Harvey filed a Landlord and Tenant Complaint in Philadelphia Municipal Court to evict the Hayes family due to termination of the lease term.  (J.A. 247)

Defendant Harvey wanted to move his daughter, Elizabeth Hindman-Harvey, who currently resides nearby in a three-bedroom unit into the Hayes family's home.  (J.A. 317).  Defendant Harvey and a business partner currently own Elizabeth Hindman-Harvey's unit and have allowed her to live there rent free. (J.A. 317).  Defendant Harvey wanted to move his daughter out of that unit because his business partner no longer wished to rent to his daughter for free. (J.A. 317).  In addition to 536-540 Pine Street, Defendant Harvey owns a little under fifty other rental units in Center City, Philadelphia.  Approximately half of these rental units he co-owns with a business partner.  (J.A. 314).

Defendant Harvey and Elizabeth Hindman-Harvey did not begin talking about her moving until early 2015.  (J.A. 318).  The only unit under discussion of where to move her was the Hayes family's home at 538B Pine Street.  (J.A. 318).

15

Elizabeth Hindman-Harvey had not viewed any of the units at 536-540B Pine

Streets as a prospective tenant and was not aware until months after her initial

conversations with her father that there were even other units in the property.

(J.A. 318). Elizabeth Hindman-Harvey was willing to move to whichever unit her

father made available to her and stated she was ready to do so at his discretion.

(J.A. 318).

During the time that Defendant Harvey sought to evict the Hayes family in

the spring of 2015 the two comparable neighboring units in the same property

parcel as the Hayes family home were available for rent. (J.A. 318). From

approximately January 2015 through June 2015 Defendant Harvey renovated the

vacant adjacent four-bedroom unit at 540B Pine Street. (J.A. 318). This unit has

the same square footage and amenities as the Hayes family's home at 538B Pine

Street, except that it has now been newly renovated to include an additional

bathroom and it is a corner unit as opposed to an inner-row unit. (J.A. 318).

Allison Hindman-Harvey listed 540B Pine Street for rent in the spring of 2015.

(J.A. 318 and 678-679). From at least May 8, 2015 through June 10, 2015 540B

Pine Street was available for rent and was not promised to a prospective tenant.

(J.A. 318). Allison Hindman-Harvey also listed the other comparable next-door

unit, 536B Pine Street, for rent in the spring of 2015. (J.A. 318 and 678-679).

536B Pine Street was available for rent from approximately May through mid-July

16

2015.  (J.A. 318).  536B Pine Street has the same square footage and amenities as the Hayes family's home, except that it was renovated to have only three bedrooms and includes an additional bathroom.  (J.A. 319).  A year later, in the spring of 2016 during the same time period that Defendant Harvey filed an eviction action in Philadelphia Municipal Court, Allison Hindman-Harvey again listed 540B Pine Street for rent.  (J.A. 247, 211-212, and 687-690).

If the Hayes family move out of their home at 538B Pine Street, their Enhanced Voucher will lose its enhanced status and they will only be able to use their regular voucher to rent a unit that falls within the Philadelphia Housing Authority's rent and utilities subsidy cap of $1,546 per month for a four bedroom unit.  (J.A. 319).

### E. Court Action.

On May 12, 2015 the Hayes family filed a Complaint and Preliminary Injunction in the Eastern District of Pennsylvania seeking to enjoin Defendant Harvey or anyone acting on his behalf from evicting the Hayes family from their home at 538B Pine Street or taking any action to accomplish such an eviction. (J.A. 30-45 and 46-78).  In lieu of a preliminary injunction hearing, the parties agreed to an expedited schedule of discovery and dispositive motions in order to obtain an expedited decision.  (J.A. 18).  On September 13 and 14, 2015 the Hayes family and Defendant Harvey filed cross motions for summary judgment.

17

(J.A. 107-142 and 143-171).  On May 10, 2016 the District Court entered an Order and Memorandum Opinion denying the Hayes family's Motion for Summary Judgment and granting Defendant Harvey's Motion for Summary Judgment and another Order denying the Hayes family's Motion for Preliminary Injunction as moot.  (J.A. 2, 3-23 and 24).  Two weeks later Defendant Harvey filed a Landlord and Tenant Complaint in Philadelphia Municipal Court on May 25, 2016.  (J.A. 247).  The Hayes family timely filed an appeal on June 2, 2016 to the Third Circuit Court of Appeals (J.A. 1) and filed a Motion for Injunction Pending Appeal in the District Court (J.A. 205-231) requesting that the District Court bar Defendant Harvey from evicting the Hayes family pending the outcome of the appeal.  On June 22, 2016 the District Court granted an injunction pending appeal.  (J.A. 248).  In light of the federal injunction, on June 28, 2016 the Philadelphia Municipal Court deferred the state eviction case pending final adjudication of plaintiffs' federal appeal.  (J.A. 248).

—————————————————

## SUMMARY OF ARGUMENT
—————————————————

This case centers around the specific Right to Remain of assisted families

under the Enhanced Voucher Statute.  Congress enacted specific protections for

project-based subsidized housing tenants to have the Right to Remain in their

homes following the termination of their subsidy to prevent their displacement.  *Id.*

Congress carved out only two exceptions to the Right to Remain to ensure it would

not be circumvented.  The Enhanced Voucher assisted family has the Right to

Remain so long as (1) the assisted family remains in the unit, and (2) the assisted

family is the same family to have initially received the Enhanced Voucher.  42

U.S.C. § 1437f(t)(1)(C).  The United States Department of Housing and Urban

Development ("HUD") has further reinforced that landlords must continue to

renew an Enhanced Voucher lease as long as the property is offered as rental

housing and there is no good cause to terminate the lease, and emphasized that the

Right to Remain extends beyond the initial year of the lease.  HUD, Section 8

Renewal Policy: Guidance for the Renewal of Project-Based Section 8 Contracts

(2008 and 2015) ("Section 8 Renewal Policy) (J.A. 249-271).  The federal courts

have unanimously upheld the Right to Remain and have ruled that good cause is

required to terminate or refuse to renew an Enhanced Voucher tenancy even after the initial lease term.

The Hayes family rent 538B Pine Street pursuant to a tenant-based voucher lease subsidized with an Enhanced Voucher. The Hayes family does not fit into any of the limited exceptions to the Right to Remain as stated by the Enhanced Voucher Statute, HUD guidance and the federal courts, and therefore evicting them would violate federal law. The District Court erred in determining that the Right to Remain does not continue beyond the initial lease term. (J.A. 12-24). The District Court arrived at this erroneous conclusion because its analysis conflated three distinct federal housing subsidies and incorrectly intermingled their statutes, regulations and HUD guidance. (J.A. 12, 16-20). The District Court's interpretation of the Enhanced Voucher Statute is contrary to the plain meaning of the statute, the District Court erred in failing to consider HUD guidance in interpreting the Enhanced Voucher Statute and misconstrued the holdings of the other courts who have considered the Right to Remain. (J.A. 3-24). The District Court's ruling should be reversed as it is in direct contradiction to the intent of Congress, HUD and the rulings of other courts to prevent the forced relocation of low-income Enhanced Voucher tenants, such as the Hayes family, despite the rapid gentrification of the neighborhoods that they have called home for many years.

———————

**ARGUMENT**

———————

## I.    <u>Scope of Review</u>

In reviewing the District Court's final decision on the parties' cross motions for summary judgment, this Court performs a plenary review.  *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010) (citing *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009)); *Albright v. Virtue*, 273 F.3d 564, 570 (3d Cir. 2001).

## II.    <u>The Hayes family's tenancy is protected by the Right to Remain.</u>

Prior to filing an eviction action against the Hayes family, Defendant Harvey sent two eviction notices: (1) on February 17, 2015 Defendant Harvey sent a sixty-day non-renewal of lease notice and (2) on May 1, 2015 Defendant Harvey sent a five-day eviction notice.  (J.A. 676 and 677).  On May 25, 2016 Defendant Harvey filed a Landlord and Tenant Complaint in Philadelphia's Municipal Court citing "termination of term" as the reason for eviction and attaching the February 17, 2015 notice.  (J.A. 247).  These notices allege that Defendant Harvey seeks to evict the Hayes family for the following reasons: (1) first due to the death of Mrs. Florence Hayes, the head of household on the Enhanced Voucher, (2) then due to Defendant Harvey's desire to renovate the unit, and (3) lastly due to Defendant Harvey's alleged desire to move a family member into the unit.  (J.A. 676 and

677).  None of these three reasons constitute sufficient good cause to override the

Hayes family's Right to Remain in their home and allow Defendant Harvey to

evict the Hayes family under the Enhanced Voucher Statute, HUD guidance, or

established case law.

### A. The Hayes family's tenancy is protected by the Enhanced Voucher Statute's Right to Remain.

Until the 1960s the main form of federally funded affordable housing was

public housing.  United States Housing Act of 1937, Pub. L. No. 75-412,

50 Stat. 888 (1937).  Public housing has always been the most stable form of

affordable housing because it is owned by the government and because good cause

is required to evict public housing tenants.  24 C.F.R. § 966.4(l) (2016).  The risk

of displacement for affordable housing tenants increased in the 1960s when the

federal government began expanding the realm of affordable housing into private

ownership with time-limited use restrictions.  First the federal government began

subsidizing and insuring mortgage loans for the construction of housing affordable

for low-income tenants through federal subsidies and regulated rents.  *See* Housing

and Urban Development Act of 1968, Pub. L. No. 90-448, §§ 201(a), 236(a)-(g),

82 Stat. 476, 498-503 (1968).  Subsequently, starting in the mid-1970s, Congress

also provided project-based rental assistance through the Section 8 program to

many of these properties, to further reduce rents to levels affordable to low-income

tenants and to provide stable income to the owner.  Housing and Community

Development Act of 1974, Pub. L. No. 93-383, tit. II, 88 Stat. 633, 653, 662

(1974).  Owners could prepay the subsidized loans after twenty years and would no

longer be part of the program and subject to its restrictions.  24 C.F.R.

§ 221.524(a)(ii) (1970).

Beginning in the 1980s, many owners chose to do so and Congress, in an

attempt to preserve affordable housing and prevent forced relocation of low-

income tenants, began enacting tenant protection policies.  Congress first enacted

restrictions on owners' ability to prepay mortgages and terminate associated

restrictions.  *See* Low Income Housing Preservation and Resident Homeownership

Act of 1990, Pub. L. No. 101-625, § 601(a), 104 Stat. 4079, 4249 (1990),

Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242,

Title II, 101 Stat. 1815, 1877-91 (1988).  Subsequently, many owners with project-

based Section 8 contracts also approached the end of their restricted-use periods.

Congress established incentives to owners to renew contracts as well as basic

procedural protections, such as advance notice, one-year in advance of the

expiration date.  See 42 U.S.C. § 1437f(c)(8); Pub. L. No. 105-276, § 219, 112

Stat. 2461, 2487-88 (1998) (uncodified); Multifamily Assisted Housing Reform

and Affordability Act, Pub. L. No. 105-65, tit. V, §§ 501-579, 111 Stat. 1344,

1384-1424 (1997) (codified at 42 U.S.C. § 1437f).

By the late 1990s Congress realized that these minimal notice protections
were insufficient to protect the low-income tenants from forced relocation.  In
1999 and then in 2000, Congress took the additional measures of enacting
legislation to create Enhanced Vouchers which protected tenants' Right to Remain
in their formerly subsidized units after the owners prepaid their loans or opted out
of their project-based subsidy contracts.  *See* Pub. L. No 106-74, § 538, 113 Stat.
1047, 1122-24 (1999) and Pub. L. No. 106-246, § 2801, 114 Stat. 511, 569 (2000)
(these Enhanced Voucher protections are currently codified as amended at
§ 1437f(t)).   In enacting the Enhanced Voucher Statute, Congress provided two
central distinguishing features: (1) a higher subsidy and (2) the tenant's right to
continued occupancy.  The Enhanced Voucher Statute currently provides that:

> *the assisted family may elect to remain in the same project in which*
> *the family was residing on the date of the eligibility event[1] for the*
> *project*, and if, during any period the family makes such an election
> and continues to so reside, the rent for the dwelling unit of the family
> in such project exceeds the applicable payment standard established
> pursuant to subsection (o) of this section for the unit,[2] the amount of

---

[1] The Enhanced Voucher Statute defines an "eligibility event" as the prepayment of
the mortgage for a multifamily housing project, the voluntary termination of the
insurance contract for the mortgage for the project or the termination or expiration
of the contract for rental assistance or the transaction under which the project was
preserved as affordable housing.  42 U.S.C. § 1437f(t)(2), see also Multifamily
Assisted Housing Reform and Affordability Act, Pub. L. No. 105-65, § 524(d), 111
Stat. 1344 (1997)  and 24 C.F.R. § 402.8.

[2] 42 U.S.C. § 1437f(o) is the section of the United States Housing Act which lays
out the provisions of the regular tenant-based voucher program.  42 U.S.C.
§ 1437f(o)(1)(B) requires that the housing authority establish payment standards
for each size unit between 90-110 percent of the fair market rent for that market

rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph (10)(A) of subsection (o) of this section and any other reasonable limit prescribed by the Secretary, except that a limit shall not be considered reasonable for purposes of this subparagraph if it adversely affects such assisted families;

42 U.S.C. § 1437f(t)(1)(B) (emphasis added).  The enhanced subsidy feature is therefore based upon the reasonable market rent charged by the landlord for the actual unit, which may significantly exceed the rent and utilities cap placed on regular tenant-based vouchers.

The Right to Remain required additional legislative effort.  When Congress first enacted the Enhanced Voucher Statute in 1999 it did not include a specific Right to Remain.  The original language enacted stated that a tenant family was entitled to an enhanced voucher "during any period that the assisted family continues residing in the same project."  Pub. L. No. 106-74, § 538, 113 Stat. 1047, 1122 (1999).  Just a year later, Congress amended the language to its current form to explicitly provide that "the assisted family may elect to remain in the same project".  Pub. L. No. 106-246, § 2801, 114 Stat. 511, 569 (2000).  *See also* H.R. Conf. Rep. No. 106-710, at 164 (2000), *as reprinted in* 2000 U.S.C.C.A.N 435, 482 (Conference Report states the amendment was for the purpose of "clarifying

---

area.  42 U.S.C. § 1437f(o)(10)(A) requires that the housing authority negotiate a reasonable rent with the landlord based on comparable units on the private market.

the intent of … section 538 of Public Law 106-74 [the 1999 enhanced voucher statute].").

Congress's intent was to protect the housing stability of low-income tenants and prevent their forced relocation.  Rep. Rick Lazio, Chairman of the House Subcommittee on Housing and Community provided written testimony, stating "[i]n many circumstances, standard vouchers are inadequate in the face of market-rate rents, forcing residents to either find other shelter or remain in their homes and face the awful choice between paying rent or buying food and medicine … enhanced vouchers will allow particularly vulnerable populations the ability to remain in their own homes." *Section 8 Housing: Hearing Before the Sen. Subcomm. on Hous. and Transp.*, 106th Cong. (1999);  *See also Senior Citizen Housing: Testimony before the Hous. and Cmty. Opportunity Subcomm. of the H. Banking and Fin. Serv. Comm. on the Aging Crisis and H.R. 202*; *Preserving Affordable Housing for Senior Citizens into the 21st Century*, 106th Cong. (1999); H.R. Rep. No. 106-379, pt. 2 at 9 (1999) (Conf. Rep.).

Under the Enhanced Voucher Statute, a tenant's Enhanced Voucher loses its enhanced status and becomes a regular tenant-based voucher, for only two stated reasons: "(i) the assisted family moves, at any time, from such project; or (ii) the voucher is made available for use by any family other than the original family on behalf of whom the voucher was provided."  42 U.S.C. § 1437f(t)(1)(C).  If the

Enhanced Voucher assisted family moves from the project, their voucher loses its

enhanced status and becomes a regular tenant-based voucher, subject to the regular

cap on rent and utility subsidy payments as established by the issuing housing

authority.  The family has no more legal ties to the project and has no right to

return there at a later date.  Section 8 Renewal Policy, §§ 11-1(B)(3) and 11-3(D).

(J.A. 251, 254 and 259).  Likewise, the Enhanced Voucher cannot be provided to a

family other than the original family living in the project at the time of the

qualifying event.  These are the only two reasons specified by the Enhanced

Voucher Statute to terminate the enhanced nature of the voucher and its special

features.

The Hayes family's situation does not fall into either of the two limited

exceptions Congress carved out of the Right to Remain: (1) the Hayes family has

not moved out of 538B Pine Street, the home they have rented since 1982, and (2)

all current members of the family were on the lease when the prior project-based

contract terminated in 2009 and the family re-leased their unit with an Enhanced

Voucher.  (J.A. 314-316).

### B. The Hayes family's tenancy is protected by the Right to Remain according to HUD guidance.

HUD has further reinforced the statutory Right to Remain by clearly stating

that landlords must continue to renew an Enhanced Voucher lease as long as the

property is offered as rental housing and there is no good cause to terminate the

tenancy.  HUD's interpretive guidance includes regulations, a policy guide and two

letters of instruction.   While the HUD regulation, 24 C.F.R. § 402.8 (2009) merely

states that "an assisted family may elect to remain in the project" and, if eligible,

receive an Enhanced Voucher, HUD provides further guidance on the Right to

Remain through its Section 8 Renewal Policy first issued in 2008:

> Tenants who receive an enhanced voucher have the right to remain in
> their units as long as the units are offered for rental housing when
> issued an enhanced voucher sufficient to pay the rent charged for the
> unit, provided that the rent is reasonable. *Owners may not terminate
> the tenancy of a tenant who exercises this right except for cause under
> Federal*, *State*, *or local law*. . . If an owner refuses to honor the
> tenant's right to remain, the tenant's remedy will depend on State and
> local law. . . *This protection continues after the first lease term.*  As
> long as the property is offered as rental housing, absent good cause to
> terminate tenancy under Federal, State or local law and provided the
> PHA continues to find the rent reasonable, *owners must continually
> renew the lease of an enhanced voucher family.*

Section 8 Renewal Policy § 11-3(B) (2008) (emphasis added).  (J.A. 252-253).

   In 2015 HUD renewed the Section 8 Renewal Policy and strengthened the

Right to Remain by amending this section to say that "[i]f an owner refuses to

honor the tenant's right to remain, the tenant's remedy will be determined by the

provision of Federal law that provides for the right to remain (i.e., 42 U.S.C.

§ 1437f(t)(1)) and on State and local law." Section 8 Renewal Policy § 11-3(B)

(2015).  (J.A. 260-261).

In addition to HUD's Section 8 Renewal Policy, HUD Deputy Assistant

Secretary for Multifamily Housing Programs, Benjamin T. Metcalf, issued a letter

on June 5, 2014, and HUD Director, Office of Housing Voucher Programs,

Michael Dennis, sent a similar letter to Public Housing Agencies Executive

Directors on May 22, 2014 (hereinafter collectively "HUD Letters Regarding

Enhanced Vouchers") reiterating the Section 8 Renewal Policy guidance and

reinforcing that Enhanced Voucher families have the Right to Remain and that this

Right to Remain "*extends beyond the initial year of the assisted family's tenancy*."

HUD Letters Regarding Enhanced Vouchers (emphasis added).  (J.A. 270-273).

### C. The Hayes family's tenancy is protected by the Right to Remain according to federal court interpretation of the Enhanced Voucher Statute and HUD guidance.

Multiple recent federal court cases have considered the good cause required

by HUD in the Section 8 Renewal Policy to evict Enhanced Voucher tenants and

each time have granted preliminary and permanent injunctions protecting

Enhanced Voucher assisted families' Right to Remain where the owner has failed

to have good cause to evict. *See Jeanty v. Shore Terrace Realty Ass'n*, No. 03-

8669, 2004 WL 1794496 (S.D.N.Y. 2004);  *Estevez v. Cosmopolitan Assocs. LLC*,

No. 05-4318, 2005 WL 3164146 (E.D.N.Y Nov. 28, 2005);  *Feemster v. BSA Ltd.*

*P'ship*, 548 F.3d 1063 (D.C. Cir. 2008), *aff'g in relevant part*, 471 F. Supp, 2d 87

(D.D.C. 2007);  *Barrientos v. 1801-1825 Morton*, *LLC*, No. 06-6437, 2007 WL

7213974 (C.D. Cal. Sept. 10, 2007), *aff'd on other grounds*, 583 F.3d 1197 (9th

Cir. 2009);  *Park Village Apartments Tenants Ass'n. v. Mortimer Howard Trust*,

636 F.3d 1150 (9th Cir. 2011).

In 2005, in *Estevez v. Cosmopolitan Assocs. LLC*, No. 05-4318, 2005 WL

3164146 (E.D.N.Y Nov. 28, 2005), the district court granted an injunction against

the Enhanced Voucher landlord barring him from refusing to renew the leases of

his Enhanced Voucher tenants.  *Estevez*, 2005 WL 3164146 at *10.  In *Estevez*, the

landlord entered into Housing Assistance Payments contracts with the local

housing authority and Enhanced Voucher leases with the eligible tenants, and then

two years later sent lease non-renewal notices.  *Id.* *2-3.  The landlord was willing

to continue renting to the tenants, but only at full market rent and without the

Enhanced Voucher subsidy.

The district court in *Estevez* ruled that Enhanced Voucher assisted families

have a private right of action to enforce their Right to Remain under 42 U.S.C.

§ 1437f(t), stating "a plain reading of [the statute] makes clear that, upon the

occurrence of an eligibility event, Section 8 tenants receive added protections,

notably the enhanced vouchers, with their increased value and the *unfettered right*

*to remain*."  *Id.* *5 (emphasis added).  The district court in *Estevez* further held that

with the Right to Remain, Congress "expressly intended to protect eligible tenants

(through the use of enhanced vouchers) from losing their homes" by requiring that

owners renew the Enhanced Voucher leases absent serious or repeated violations

of the lease or other good cause. *Id*. The court reached this conclusion by

analyzing Congressional intent in enacting the Enhanced Voucher Statute and its

associated Right to Remain just four years after repealing the "endless lease"

provision for regular tenant-based vouchers. *Id*. at *6-7.

In 2007, in *Barrientos v. 1801-1825 Morton*, *LLC*, No. 06-6437, 2007 WL

7213974 (C.D. Cal. 2007) ("*Barrientos I*"), the federal district court granted

summary judgment and a permanent injunction to allow Enhanced Voucher

assisted tenants to remain in their homes because their landlord's attempt to refuse

to renew their leases for a business or economic reason did not constitute sufficient

good cause to fail to renew the tenants' Enhanced Voucher leases. *Barrientos I*,

2007 WL 7213974 at *20. In 2009 in *Barrientos v. 1801-1825 Morton*, *LLC*, 583

F.3d 1197 (9th Cir. 2009) ("*Barrientos II*"), the Ninth Circuit affirmed the district

court's granting of the tenant plaintiff's Motion for Summary Judgment.

*Barrientos II*, 583 F.3d at 1202. Under a regular tenant-based voucher lease, an

owner can only terminate during the lease term for serious or repeated violations of

the lease or other good cause. 42 U.S.C. § 1437f(o)(7)(C). However, both the

district court and the Ninth Circuit held that an Enhanced Voucher landlord would

need a good cause reason to refuse to renew the lease in addition to needing it to

evict during the lease term. *Barrientos I*, 2007 WL 7213974 at *9 and *Barrientos*

*II*, 583 F.3d at 1207.

HUD has defined "other good cause" to normally include a "business or

economic reason for termination of the tenancy (such as sale of the property,

renovation of the unit, or desire to lease the unit at a higher rental)" and this

definition is reflected in the lease. 24 C.F.R. § 982.310(d)(1)(iv) (2015). The

district court in *Barrientos I* found a higher standard of good cause is required to

terminate or refuse to renew Enhanced Voucher leases due to the market-rate rents

guaranteed by the Enhanced Voucher statute. *Barrientos I*, 2007 WL 7213974

at *9. The district court stated that "given the clear right to remain established by

[§ 1437f(t)], Congress could not have intended that a recognized justification for

enhanced vouchers—rent increases—would also constitute 'other good cause' to

evict those same tenants." *Id.* The district court therefore ruled that owners cannot

evict Enhanced Voucher assisted tenants for other good cause due to a business or

economic reason, as would be permissible if the tenants had a regular tenant-based

voucher. The Ninth Circuit upheld the district court's granting of summary

judgment and entry of the permanent injunction on other grounds,[3] though the

Court stated that they agreed "that the eviction [based on a desire to raise the rent]

_____

[3] The Ninth Circuit held that local eviction protections are not impliedly preempted
by federal law because there is no conflict. Although the court agreed that the
eviction also violated the enhanced voucher tenants' right to remain, it found such a
holding unnecessary. *Barrientos II*, 583 F.3d at 1207.

violated the Enhanced Voucher Tenants' right to remain." *Barrientos II*, 583 F.3d at 1207.

In 2011, in *Park Village Apartments Tenants Ass'n.*, *v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011), the Ninth Circuit again upheld the district court's grant of a preliminary and permanent injunction to stop an owner from evicting Enhanced Voucher tenants based upon the statutory Right to Remain, although reversing for lack of the required showing of irreparable harm that portion of the injunction that required the owner to enter into Housing Assistance Payments contracts with the local housing authority. *Park Village*, 636 F.3d at 1152. The Ninth Circuit held "that § 1437f(t) provides tenants a right to remain in their previously subsidized Section 8 rental units in the absence of just cause for eviction, and that tenants with enhanced vouchers cannot be required to pay more than their portion of the rent as defined by the Section 8 statute and applicable regulations." *Id.* at 1163. In *Park Village*, where the owner had refused to enter into Housing Assistance Payments contracts for the Enhanced Voucher assistance for the eligible tenants (*id.* at 1155), the court held that "if owners are willing to forego significant rental income in order to avoid the obligations imposed by HAP contracts, they are free to do so," but the owner still cannot evict the Enhanced Voucher tenants. *Id.* at 1161.

33

Time and again when presented with an owner's attempt to evict or refuse to renew the lease without good cause, federal courts have granted preliminary and permanent injunctions preventing the owner from evicting the tenant: an owner cannot refuse to accept the Enhanced Vouchers; an owner cannot evict even if he refuses to enter into Housing Assistance Payments contracts so long as the tenants continue to pay the tenant share of the rent; and an owner cannot evict or refuse to renew a lease due to a desire to increase the rents, since the Enhanced Voucher rents are market-rents.

### D. Defendant Harvey does not have sufficient good cause to evict the Hayes family.

Defendant Harvey does not think he needs good cause to evict the Hayes family from their home.  Based on Defendant Harvey's statements made in his deposition, Defendant Harvey believes that he has "the right to do with that place as I wish" and believes that this action is a "game" to try to interfere with his "ownership of my privately-owned property."   (J.A. 531, 548 and 544). Defendant Harvey does not believe that there are any differences between the rights and protections afforded a private tenant and those afforded to voucher tenants, even to Enhanced Voucher assisted tenants.  (J.A. 524).  Defendant Harvey does not believe he has to have good cause to evict the Hayes family and summarized his position by stating:

34

> I don't think it has nothing to do with my daughter. I think it has to
> do with my right to be able to take that property and renovate it and be
> able to use it as I please ... I don't think I have to have good cause. I
> mean, that's your language. That's your stipulations. That's the
> reason we're having this confrontation. You have your game to play,
> and I am not entering into that game. (J.A. 547-548).

Regardless of his belief that he does not need good cause, Defendant Harvey, in his

two eviction notices put forth three alleged reasons for evicting the Hayes family:

(1) due to the death of the head of household, (2) in order to fully renovate the unit;

or (3) in order to rent the unit to a family member. (J.A. 676 and 677).

Defendant Hayes' first eviction notice listed Mrs. Hayes's recent death as

one of the bases for the lease termination. (J.A. 676). The death of the head of

household on the lease does not affect the Hayes family's Right to Remain with

their Enhanced Voucher. The Enhanced Voucher Statute provides that the

Enhanced Voucher does not pass from the original assisted family to another upon

moving out. 42 U.S.C. § 1437f(t)(1)(C). However in this instance, the assisted

family has not moved out, the only change is that the head of household, Mrs.

Florence Hayes, passed away. (J.A. 314 and 316). There have been no additions

to the Hayes family's lease and all current household members—Mrs. Hayes' son,

Plaintiff Theodore Hayes, granddaughter, Plaintiff Aqeela Fogle, and her three

minor children—have all been on the lease since before the Enhanced Voucher

was issued to the Hayes family in 2010. (J.A. 314 and 316). Therefore, the

assisted family is the original family that was granted an Enhanced Voucher in

2010 and their Right to Remain is not affected by the death of the former head of household in this instance.

Defendant Harvey's eviction notices also stated a desire to renovate the unit as grounds for the lease termination. (J.A. 676 and 677). Renovation of the unit does not terminate the Hayes family's Right to Remain with their Enhanced Voucher. If Defendant Harvey were to renovate the Hayes family's home, the Philadelphia Housing Authority would be statutorily required to increase the monthly contract rent to a reasonable level to reflect the increased market value of the unit. 42 U.S.C. § 1437f(t)(1)(B). *See also* Section 8 Renewal Policy § 11 and HUD Letters Regarding Enhanced Vouchers. (J.A. 250-251, 258-259, 270-273). Therefore, Defendant Harvey's desire to renovate the unit does not terminate the Hayes family's Right to Remain in their home. *See Barrientos I*, 2007 WL 7213974 at *9 and *Barrientos II*, 583 F.3d at 1214-15.

Defendant Harvey's second eviction notice claimed he would be moving a family member—his daughter and her family— into the Hayes family's home. (J.A. 317 and 677). Defendant Harvey's allegation that he is moving his daughter into the Hayes family's specific unit does not fall into either of the two statutory exceptions to the Right to Remain, nor does it meet the requirements of HUD guidance. Defendant Harvey intends to continue providing the Hayes family's home as rental housing, as he intends to rent the unit to his daughter and charge her

rent once she begins earning an income.  (J.A. 539).  Furthermore, Defendant

Harvey's claim is suspect and does not provide sufficient good cause for eviction

because Defendant Harvey could easily have moved his daughter into either of the

two neighboring units to the Hayes family, or into one of the other approximately

fifty properties that Defendant Harvey owns in Center City.  (J.A. 314-318, 678-

681 and 687-690).

        During the time period that Defendant Harvey sent the two eviction notices

to the Hayes Family in 2015 and for another month after the filing of this case in

the District Court, Defendant Harvey was renovating the two neighboring units in

the same property parcel, 536B and 540B Pine Street, with the intention of

immediately re-renting them.  (J.A. 318-319 and 678-681).  Both these neighboring

units are equivalent in size to the Hayes family's home.  (J.A. 315).  Furthermore,

a year later in 2016, at the same time that Defendant Harvey filed a Landlord and

Tenant Complaint to evict the Hayes family, Defendant Harvey again listed 540B

Pine Street for rent.  (J.A. 247, 211-212 and 687-690).  Therefore, Defendant

Harvey's alleged desire to move his daughter into the Hayes family's unit as

opposed to one of the other comparable units is concocted and not sufficient good

cause to terminate the Hayes family's Right to Remain.

**III.    The District Court erred in determining that the Right to Remain does not extend beyond the initial Enhanced Voucher lease term.**

The District Court's Order and Memorandum Opinion misinterpreted the statutory, regulatory and case law construction of the Enhanced Voucher assisted tenant's Right to Remain. The District Court conflated three distinct federal subsidies and inappropriately applied the wrong regulations to the Enhanced Voucher program, which is at issue in this case.

The Hayes family contend that the Enhanced Voucher Statute, HUD's regulatory guidance, and case law all dictate that an Enhanced Voucher lease can be terminated only when: (1) the leased premises is no longer offered as rental housing, (2) the tenant family is no longer the family to have received the Enhanced Voucher, or (3) the landlord has good cause to terminate or refuse to renew the lease. The District Court did not analyze these three factors in light of the facts of the case and instead found that landlords can refuse to renew Enhanced Voucher leases without cause at the end of the lease term. (J.A. 3-23).

**A. The District Court's analysis conflated three federal subsidies and incorrectly intermingled their statues and regulations.**

Throughout the District Court's analysis, the District Court conflated three federal subsidies—project-based Section 8, regular tenant-based Section 8 voucher and Enhanced Voucher—and incorrectly intermingled their statutes and regulations in reaching the erroneous legal interpretation of the statute. While all

38

three federal subsidies stem from Section 8 of the United States Housing Act, 42

U.S.C. § 1437f, they each serve very different purposes and are each governed by

distinct sections of the statute.

The project-based program rental subsidy is tied to the multi-family project.

A project-based owner entered into an initial long-term (often twenty-year)

Housing Assistance Payments contract with HUD for a subsidy for an entire

building, or a portion of a building.  The subsidy does not go with the tenant if the

tenant moves out.  The project-based funding however would continue to subsidize

a tenant for as long as they lived in the property and, importantly, the landlord

could not evict or refuse to renew except for good cause.  24 C.F.R. § 880.607

(2010).  In the 1990s and early 2000s, Congress enacted specific amendments to

the United States Housing Act to protect tenants living in project-based units if the

owner chose not to continue with the project-based subsidy program.  These

protections include a lengthy notice period, the specifics of the notice given to the

tenants, and a replacement subsidy (the Enhanced Voucher) to protect the existing

tenant's ability to continue living affordably in their homes, despite the owner's

desire to no longer maintain the entire project as affordable housing.

The regular tenant-based Section 8 voucher program is a different subsidy

framework in which the subsidy is administered by the local housing authority and

is provided on behalf of individual tenant families to their private landlords.  The

39

tenant-based voucher program is governed by a different subsection of the United

States Housing Act and has a separate set of HUD regulations. 42 U.S.C.

§ 1437f(o) and 24 C.F.R. § 982 (2015).

While some of the terminology used in the project-based and voucher-based

programs is the same, there are very different rules and regulations governing these

two distinct subsidy frameworks, supported by differing policy needs. In contrast

to the longer-term commitments of the project-based program, the regular tenant-

based voucher program is different in that the private landlord for each regular

tenant-based voucher family, enters into a Housing Assistance Payments contract

with the local housing authority (not with HUD) and this contract terminates when

the tenancy is validly terminated for cause during its term, or at-will at the end of

its term or any extensions. Prior to 1996, a tenant-based landlord needed good

cause to terminate a regular tenant-based voucher tenancy at any time (either mid-

lease term or at the end of a lease term), just like in project-based housing, but

since 1996 a tenant-based voucher landlord only needs good cause to terminate

during the lease term and is free to do so at will at the end of the lease term.

In contrast to both the project-based subsidy and the tenant-based subsidy is

the discrete world of Enhanced Vouchers. The Enhanced Voucher program was a

specific protection that Congress created to deal with the situation of tenants left in

a precarious housing situation when the owners of their project-based subsidized

building chose to no longer maintain the project as affordable housing.  The Enhanced Voucher program has two key components: (1) the right of the assisted tenant family to elect to remain in their unit and (2) the requirement that the housing authority will pay a reasonable market rent for the unit, even where that rent is above the normal cap on voucher subsidy payments.  42 U.S.C. § 1437f(t)(1)(B).  Both of these statutory requirements are essential to the purpose of the Enhanced Voucher program to recreate the stability of project-based housing, because without either element, the Enhanced Voucher program would not actually enable tenants to remain in their homes with affordable rent contributions.

Especially significant here, Congress took specific action to clarify the Right to Remain by amending the statutory Enhanced Voucher language several months after initial enactment. Pub. L. No. 106-246, § 2801, 114 Stat. 511, 569 (2000). When Congress first enacted the Enhanced Voucher Statute in 1999, it did not include a specific Right to Remain.  The original language enacted stated that a tenant family was entitled to an Enhanced Voucher "during any period that the assisted family continues residing in the same project."  Pub. L. No. 106-74, § 538, 113 Stat. 1047, 1122 (1999).  Within a year later, Congress amended the language to its current form to explicitly provide that "the assisted family *may elect* to remain in the same project".  Pub. L. No. 106-246, § 2801, 114 Stat. 511, 569

41

(2000). The Right to Remain enables Enhanced Voucher tenants to retain the

protection against eviction or lease non-renewal without good cause they had as

project-based tenants so as to be protected from forced relocation.

In its Memorandum Opinion, the District Court at times conflated the opt-

out process for project-based owners seeking to end their decades' long Housing

Assistance Payments contract for an entire housing project with an eviction or

lease non-renewal notice by a landlord to an individual tenant with an Enhanced

Voucher. (J.A. 13 and 16-17). The District Court erred in failing to focus on the

statutes, regulations and case law which governs when and how a landlord can

terminate or decide not to renew an individual tenant's Enhanced Voucher lease.

Instead, the District Court focused on the distinct but inapplicable statutory and

regulatory process for a project-based owner to opt-out of renewing its contract for

an entire subsidized project, in a misguided attempt to understand Congress's

intent on whether an Enhanced Voucher landlord could renew any lease, regardless

of the type of subsidy and statutory provisions governing that unique subsidy.

(J.A. 16-17).

The District Court also misapplied the rules for terminating or not renewing

a lease under the regular tenant-based voucher program with those applicable to

the Enhanced Voucher program. (J.A. 21). The District Court order cites to a

section of the statute, § 1437f(o)(7)(C), which applies to the regular tenant-based

42

voucher program, but fails to find that it is superseded by § 1437f(t)'s Right to

Remain for Enhanced Voucher tenants.  (J.A. 21).  The Enhanced Voucher

program, from a policy perspective, is a unique program in that it was created to

ensure that subsidized housing tenants were protected from forced relocation,

despite the decision of their project's landlord to no longer offer the whole project

as affordable housing.   (J.A. 283 and 285).  For this specific and narrowly defined

purpose, Congress enacted statutory requirements that gave these vouchers an

enhanced nature—specifically, the Right to Remain and the corresponding, and

often necessary, increased subsidy payments.  Congress did not extend these

protections to all regular tenant-based voucher holders.  HUD guidance makes

clear that the Right to Remain is protected except in specific circumstances where

there is good cause to force the relocation of Enhanced Voucher tenants.

### B. The District Court's interpretation of the Enhanced Voucher Statute is contrary to the plain meaning of the statute.

The District Court's interpretation of the Enhanced Voucher Statute is

contrary to the plain meaning of the statute.  The District Court read the Enhanced

Voucher Statute very narrowly as saying that *if* the tenant elects to remain; the

housing authority is *only* required to pay an appropriate subsidy amount to allow

the tenant to do so.  (J.A. 14).  Erroneously finding that the statute is silent on the

issue, the District Court did not find that the Enhanced Voucher Statute obligates

43

an owner to continue renting to a tenant absent good cause for tenancy termination. (J.A. 14 and 19).  This reading directly contradicts the established plain meaning rule.  Congress's chosen language, consciously clarified shortly after initial enactment, clearly ties the Right to Remain to the assisted family and the property and is binding on the owner.  As revised in 2000, the statute provides that "*the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project*."  42 U.S.C. § 1437f(t)(1)(B) (emphasis added).  The two exceptions to the Right to Remain specified in the statute further emphasize that the Right to Remain is dependent on the actions of the tenant and not at the discretion of the owner: "(i) the assisted family moves, at any time, from such project; or (ii) the voucher is made available for use by any family other than the original family on behalf of whom the voucher was provided."  42 U.S.C. § 1437f(t)(1)(C).

Statutes should be read and understood according to their plain language. *McNeil v. United States*, 131 S. Ct. 2218, 2221 (2011); *United States v. Cooper*, 396 F.3d 308, 310 (3d Cir. 2005).  The plain language of the Enhanced Voucher Statute specifies the tenant's election to remain, and references only changes involving the assisted family—not  actions taken by the property owners—as affecting the enhanced subsidy. The language makes it clear that the Right to Remain cannot be terminated at will by the owner.

44

The District Court further misinterpreted legislative intent in support of its conclusion.  (J.A. 14-15).  The District Court analyzed the legislative intent behind Congress's decision to do away with the good cause requirement for landlords renting to tenants with regular tenant-based vouchers at the end of a lease term— initially, back in 1996—and superimposed this legislative intent onto the Enhanced Voucher Statute that was separately enacted in 1999 and clarified in 2000. (J.A. 14-15).  Instead, the meaning of the Enhanced Voucher Statute should be deduced from the legislative intent of Congress's development of that statute.

These actions by Congress in 1999 and 2000 regarding the Enhanced Voucher program stand in stark contrast to Congress's previous actions in 1996 to allow landlords renting to regular voucher tenants to terminate the tenancy without good cause at the end of a lease term.  When evaluated against this backdrop, it becomes clear that Congress intended to distinguish the Enhanced Voucher program from the regular tenant-based voucher program and provided increased protections to Enhanced Voucher tenants that would allow them to remain in their often rapidly gentrifying neighborhoods, despite possibly contrary desires of their landlords to evict.

In *Barrientos II* the Ninth Circuit requested that HUD provide the court with an Amicus Brief. *Barrientos II*, 583 F.3d at 1213. HUD filed a brief[4] for the United States as Amicus Curiae Supporting Affirmance of the District Court's Judgment ("HUD Amicus Brief") in upholding the Right to Remain of the Enhanced Voucher tenants. *Id*. at 1213-14. In its brief, HUD notes its support for the district court's Enhanced Voucher analysis that not only is good cause required to evict of refuse to renew an Enhanced Voucher lease, but the good cause reason may be invalid when assessed in light of the Enhanced Voucher's special properties:

> [The] district court concluded that the HUD regulation's definition of "good cause" to include a landlord's desire to raise rents "effectively thwart[s] Congress's plan for enhanced-voucher tenants." The court explained that, in subsection 1437f(t), Congress gave Enhanced Voucher tenants "the right to remain even if an owner desires to increase the rental rate of a unit." HUD's regulation, however, "permit[s] an owner to circumvent the congressionally created rights of enhanced-voucher tenants." The district court therefore held that the regulation conflicts with and "must yield to the clear terms and intent of subsection [1437f(t)]," and, to the extent that that regulation permits an eviction "based on the 'desire to lease the unit at a higher rental,'" it "cannot be enforced against tenants using enhanced vouchers."

HUD Amicus Brief in *Barrientos II*, p. 10.

---

[4] Brief for the United States as Amicus Curiae Supporting Affirmance of the District Court's Judgment, *Barrientos II*, 583 F.3d 1197 can be found at http://nhlp.org/node/1130.

HUD argues that Congress knew about the removal in 1996 of the good cause requirement for termination of regular tenant-based voucher leases before enacting the Enhanced Voucher Statute in 1999 and reinforcing it in 2000, and therefore intended that the Right to Remain would include an added layer of protection for Enhanced Voucher tenants from eviction without good cause. HUD Amicus Brief in *Barrientos II* at n.5 ("HUD generally agrees with the district court's Enhanced Voucher analysis … HUD promulgated its "good cause" regulation well before Congress created the Enhanced Voucher program, and that regulation is not intended to deny Enhanced Voucher tenants the right to remain in the same project that is guaranteed by statute, 42 U.S.C. § 1437f(t)(1)(B)."). The District Court in this case's interpretation of the Enhanced Voucher Statute—that the owner can terminate the tenant's ability to remain without good cause at the end of the lease term—renders the special statutory Right to Remain meaningless after the initial lease term.

### C. The District Court erred in failing to consider agency guidance.

The District Court should have deferred to HUD guidance to interpret the Enhanced Voucher Statute. The District Court oddly failed to mention or consider two key items of recent guidance provided by HUD: (1) the HUD Section 8 Renewal Policy issued in 2008 and renewed in 2015, and (2) HUD Letters Regarding Enhanced Vouchers, all of which specifically address the rights of the

Enhanced Voucher program.  (J.A. 249-269 and 270-273).  HUD, in its 2008 and

again in its 2015 issuances of the Section 8 Renewal Policy, reinforced the

Enhanced Voucher Statute's Right to Remain, by clearly stating that landlords

must continue to renew an Enhanced Voucher lease as long as the property is

offered as rental housing and there is no good cause to terminate the lease.

(J.A. 252-253 and 260-261).  The HUD Letters Regarding Enhanced Vouchers

reinforce this guidance and specifically state that the Enhanced Voucher's Right to

Remain "*extends beyond the initial year of assistance*."  (emphasis added).

(J.A. 270-273).

　　　　For over thirty years the courts have deferred to agency interpretation of the

laws that they administer either under the heightened *Chevron* deference or under

the lesser *Skidmore* deference.  *Chevron U.S.A.*, *Inc. v. NRDC*, 467 U.S. 837

(1984); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  The Third Circuit, citing to

*Chevron*, has held that "affording agencies significant discretion to interpret the

law they administer recognized the value of agency expertise and the

comparatively limited experience of the judiciary where an interpretation requires

specialized knowledge."  *Hagans v. Commissioner of Social Sec.*, 694 F.3d 287,

294 (2012) citing *Chevron*, 467 U.S. at 865.  Regardless of which level of

deference applies, the court must first determine whether the language of the

statute is ambiguous.  The Hayes family's position is that the Enhanced Voucher

48

Statute states that Enhanced Voucher tenants have a binding Right to Remain in their units and that at least *Skidmore* deference should be given to HUD's interpretation of the Enhanced Voucher Statute.  Pursuant to *Skidmore*, the District Court should have assigned a "weight" to the administrative judgment based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore*, 323 U.S. at 140.  *See also Park Village*, 636 F.3d at 1157 (*Skidmore* deference should be given to the Section 8 Renewal Policy's interpretation of the Enhanced Voucher Statute).  In this case, the District Court failed to mention, much less assign any weight to, HUD's well-considered interpretation of the Enhanced Voucher Statute's Right to Remain.

### D. The District Court's interpretation conflicts with the unanimous decisions of the other federal courts that have interpreted the statute.

The District Court's ruling that the Enhanced Voucher Statute does not require landlords to renew Enhanced Voucher leases is in opposition to the decisions of other federal courts that have unanimously and emphatically upheld Enhanced Voucher tenants' Right to Remain.  Multiple recent federal court cases have ruled on the Right to Remain and each time have granted preliminary and permanent injunctions protecting assisted tenants' Right to Remain.  *See Jeanty v.*

49

*Shore Terrace Realty Ass'n*, No. 03-8669, 2004 WL 1794496 (S.D.N.Y. 2004);

*Estevez v. Cosmopolitan Assocs. LLC*, No. 05-4318, 2005 WL 3164146 (E.D.N.Y

Nov. 28, 2005); *Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063 (D.C. Cir. 2008),

*aff'g in relevant part*, 471 F. Supp. 2d 87 (D.D.C. 2007); *Barrientos v. 1801-1825*

*Morton*, *LLC*, No. 06-6437, 2007 WL 7213974 (C.D. Cal. 2007) , *aff'd on other*

*grounds*, 583 F.3d 1197 (9th Cir. 2009); *Park Village Apartments Tenants Ass'n v.*

*Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011).

In analyzing the case law, the District Court in this case ignored or

misinterpreted the most applicable case law provided in *Estevez*, *Barrientos I* and

*II*, and *Park Village*.  Instead the District Court again conflated the legal

requirements for the project-based program and those of the Enhanced Voucher

program.  The District Court summarily dismissed the extensive recent body of

case law as non-binding and instead focused on one case, which is inapplicable to

the issue in this case, *People to End Homelessness*, *Inc. v. Develco Singles*

*Apartments Assocs*, 339 F.3d 1 (1st Cir. 2003).  (J.A. 17 and 21-22).  *Develco* dealt

with the issue of whether HUD could require that a project-based owner renew a

project-based Housing Assistance Payments contract and whether HUD had a duty

to provide Enhanced Vouchers when the owner failed to renew.  (J.A. 17).

*Develco* has no bearing on whether a landlord renting to a tenant with an Enhanced

Voucher can or cannot be required to renew the lease at the end of the lease term.

50

The District Court in this case then erroneously applied the holding in *Develco* and the associated project-based opt-out statutory requirements to analyze Defendant Harvey's actions. (J.A. 18-19). Even while acknowledging that Defendant Harvey is not an opting-out project-based owner and does not need to comply with the one-year notice, the District Court argued that Defendant Harvey is in compliance because he essentially provided one-year notice. (J.A. 18-19).

### E. The District Court erred in finding that the Right to Remain does not extend beyond the initial Enhanced Voucher lease term.

The Enhanced Voucher Statute, HUD's guidance and the Courts' rulings clearly show that the Enhanced Voucher rights and protections, including the Right to Remain, run with the assisted family while they live in the property, and continue beyond the initial lease term. Even the District Court in this case agreed that Defendant Harvey is bound by the provisions of the Enhanced Voucher Statute, despite his arguments to the contrary. (J. A. 11-12). The District Court specifically stated that Defendant Harvey, even though he purchased the property from the prior project-based owner and was not the owner to have opted-out of renewing the project-based contract, is still bound by the Enhanced Voucher Statute. (J.A. 11-12). Defendant Harvey continues to receive a monthly subsidy from the Philadelphia Housing Authority far in excess of what the housing authority would pay for a regular tenant-based voucher because the housing

51

authority is paying market rent for a unit in one of Philadelphia's most gentrified neighborhoods, as they are statutorily required to do. (J.A. 316).

However the District Court erred in finding that the Right to Remain can be divorced from the market-rent requirement of the statute that makes the Right to Remain possible. The District Court held that an Enhanced Voucher landlord can continue to accept the increased subsidy payment without being bound by the Right to Remain after the initial lease term. (J.A. 14).

The District Court erred in its ruling in this case that Defendant Harvey can evict or refuse to renew the Hayes family's lease without good cause. (J.A. 12). Since the Enhanced Voucher Statute applies to the Hayes family's tenancy, the Enhanced Voucher Statute, HUD's guidance, and the case law all require Defendant Harvey to have good cause to terminate or refuse to renew the Hayes family's Enhanced Voucher lease even after the initial year of the lease. The Enhanced Voucher Statute lists only two exceptions to the Right to Remain and never references a time-limit. HUD's guidance specifically state that the Right to Remain extends beyond the initial year of the tenancy. The case law clearly states that if an owner could terminate or refuse to renew the lease without good cause, the Right to Remain would be rendered meaningless.

Two prior cases have specifically dealt with landlords refusing to renew Enhanced Voucher leases after the initial term of the lease has expired. In 2005 in

*Estevez* the landlord entered into Housing Assistance Payments contracts with the local housing authority and Enhanced Voucher leases with the eligible tenants, and then two years later sent lease non-renewal notices. *Estevez*, 2005 WL 1794496 at *2-3. The district court granted an injunction enjoining the landlord from refusing to renew the tenants' leases and ordering him to continue to accept their Enhanced Voucher subsidy. *Estevez*, 2005 WL 1794496 at *10.

In 2009 in *Barrientos* the owner sent lease non-renewal notices[5] to the Enhanced Voucher tenants eight years after the tenants entered into Enhanced Voucher leases. *Barrientos II*, 583 F.3d at 1206. Similarly to this case, the eviction notices in *Barrientos* stated that the grounds for termination of the tenancy were a business or economic reason. *Id.* The District Court in this case ignored the *Barrientos* ruling in both the district court and the Ninth Circuit, which held that good cause was required to refuse to renew Enhanced Voucher leases years after the leases were initially entered into. *Id.* at 1207. (J.A. 21-22). The District Court misinterpreted the *Barrientos* holding as saying that good cause was not required and misquoted the *Barrientos* district court opinion, which stated that

---

[5] Exhibit A to Plaintiffs' Complaint in *Barrientos I* is a sample 90-day notice to the Enhanced Voucher tenants stating "this is intended as a ninety day notice to terminate your month to month Section 8 tenancy …the grounds for termination of your tenancy are based upon paragraph 8 of your housing assistance payments contract and 24 C.F.R. 982.310(d)(iv), which allows the landlord to terminate the rental agreement for a business or economic reason …" Exhibit A is available at http://nhlp.org/files/800070A.pdf.

good cause *was* required. *Barrientos I*, 2007 WL 7213974 at \*4-7; *Barrientos II*, 583 F.3d at 1207. (J.A. 21-22).

Both *Estevez* and *Barrientos* clearly show that the Enhanced Voucher Statute requires good cause to refuse to renew Enhanced Voucher leases and supersedes § 1437f(0)(7)'s requirement of good cause to terminate a tenancy only during the lease term for regular voucher tenants. The District Court erred in finding that an Enhanced Voucher owner could refuse to renew an expiring lease under local law, which "generally include [as grounds for termination] the expiration of a lease term." (J.A. 22). The Supremacy Clause establishes that federal law controls over state or local law. Therefore, while Pennsylvania local law does allow for termination of the tenancy due to expiration of the lease term without good cause, most subsidized landlords are prohibited under federal law from evicting tenants without good cause, and are therefore not allowed to do so under local law. Public housing tenants, Section 8 project based tenants, and low income housing tax credit tenants' are all federally protected from eviction or lease non-renewal without good cause. 24 C.F.R. § 966.4(l) (2016) (public housing tenants can only be evicted for serious or repeated violations of the lease or other good cause), 24 C.F.R. § 247.3 and § 247.4 (project-based tenants can only be evicted for substantial or repeated violations of material provisions of the lease or other good cause), and Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-

508, § 11701(a)(7), 104 Stat. 1388-506 (1990) and IRS Rev. Rul. 2004-82, Q&A 5 (2004) (low income housing tax credit tenants can only be evicted for good cause).

Congress, HUD and the federal courts have spent significant time and effort to enact and uphold the Right to Remain for low-income families who face the termination of their project-based subsidy by providing them with Enhanced Vouchers and increased subsidies that will guarantee them the ability to remain in their homes, even as the neighborhoods around them rapidly gentrify.  The District Court ruling is in direct opposition to the plain meaning of the statute, HUD's guidance and federal case law and would render the Right to Remain of low-income families such as the Hayes family meaningless.  Accordingly, the District Court's ruling should be reversed.

---

## CONCLUSION

---

In view of the above errors, the Hayes family respectfully requests that this

Honorable Court reverse the District Court's final decision, find that Defendant

Harvey does not have good cause to evict the Hayes family, and remand to the

District Court to enter a permanent injunction.


Dated: September 30, 2016                Respectfully submitted,

/s/ Rachel Garland_____
Rachel Garland, Esq. 206349
George D. Gould, Esq. 12549
Michael Donahue, Esq. 25851
COMMUNITY LEGAL SERVICES, INC.
1424 Chestnut Street
Philadelphia, PA  19102
Phone: 215.981.3778
Fax:  215.981.0434
rgarland@clsphila.org
Attorneys for Appellants

---

## CERTIFICATIONS OF COMPLIANCE WITH RULES
---

I HEREBY CERTIFY that I am a member in good standing of the Bar of the

United States Court of Appeal for the Third Circuit.

I FURTHER CERTIFY that the word count of the attached brief complies

with the rules of the Third Circuit in that our Word software shows that the brief

has 12,814 words, that simultaneous service of the attached brief and the Joint

Appendix on counsel of record has been made through the electronic filing system

and by hand-delivery, that the text of the electronic brief and the hard copies filed

with the court are identical, and that a virus detection program named Trend Micro,

version 9.850.1008, has been run on the filings and the documents have been found

to be virus free.


Dated: September 30, 2016          /s/ Rachel Garland
                                   Rachel Garland, Esquire
                                   Counsel Appellants